IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARK J. CHRISTMAN,  )
                    Plaintiff  )
                               )
        vs.                    )        Civil Action No. 07-397
                               )        Magistrate Judge Amy Reynolds Hay
TYMACO, INC. and               )
ICE CASTLE, INC.,              )
                    Defendants )

## FINDINGS AND CONCLUSIONS BY THE COURT

HAY, Magistrate Judge

      The instant claim of disability discrimination arises under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, et seq. The parties tried the case to this Court on January 9-10, 2008.[1] Having heard the testimony and reviewed the exhibits, pursuant to Fed.R.Civ.P. 52(a)(1) the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

      1.     Plaintiff, Mark J. Christman ("Plaintiff" or "Christman"), brought suit against Tymaco, Inc. ("Tymaco") and Ice Castle, Inc. ("Ice Castle")(collectively, the "Defendants"), pursuant to the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, et seq. ("ADA"), on the grounds that the defendants discriminated against him in the full and equal enjoyment of the facilities of Ice Castle Arena, a place of public accommodation. Amended Complaint, Dkt. [21].

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73, the parties consented to have a United States magistrate judge conduct all proceedings in this case, including the entry of final judgment. Dkt. [3].

2. Christman is 47 years old, married and has 3 children.  He suffers from facioscapulohumeral muscular dystrophy, which is a form of muscular dystrophy that causes progressive weakening and loss of skeletal muscles.  Christman requires a wheelchair for mobility.  Trial Transcript ("TR") 13-15.

3. Christman is an individual with a disability within the meaning of the ADA.  <u>See</u> Stipulation, Dkt. [31]; <u>see</u> <u>also</u> Exhibit 1.

4. Christman's 13 year-old son, Zach, plays ice hockey at Ice Castle Arena.  TR 15-17.

5. Ice Castle Arena is a place of public accommodation within the meaning of the ADA since it is open to the public for such activities as ice hockey games and practices, public skating, parties and events.  TR 12; 42 U.S.C. § 12182(7)(providing that private entities, such as "a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation," are considered public accommodations if their operations affect commerce).

6. Title III of the ADA addresses discrimination against individuals with disabilities "in the full and equal enjoyment" of places of public accommodation.  42 U.S.C. § 12182(a).  The general rule, set forth in Section 12182(a), provides as follows:

> No individual shall be discriminated against on the basis of a disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).

7. Christman attends his son's hockey practices and games at Ice Castle Arena.  TR 17-19.

8.      Christman complains that the defendants have violated the ADA as follows: (a) by failing to provide wheelchair users with an accessible route from the parking lot to the Ice Castle Arena that coincides to the maximum extent feasible with the route taken by the general public and/or by failing to locate the handicapped parking spaces on the shortest route from adjacent parking to an accessible building; (b) by having doorways to the elevator lobby that do not comply with the minimum required space for a clear opening; ©)  because the elevator and the balcony area are not on an "accessible route;" and (d) because there are no wheelchair areas that are an integral part of the fixed seating.  Amended Complaint, Dkt. [21]; TR 13-101.

9.      Tymaco owns the real property and certain improvements at 990 Castle Shannon Boulevard, Pittsburgh, Pennsylvania, including a two-story commercial building.  The building has two tenants, Ice Castle Arena and Club One Xpress, LLC, an exercise/health club facility.  TR 184; Exhibit 10.

10.      As an owner and lessor of Ice Castle Arena, Tymaco is subject to the requirements of Title III of the ADA.  42 U.S.C. § 12182(a)("No individual shall be discriminated against on the basis of a disability ... by any person who owns ... (or leases to) ...").

11.      Ice Castle operates under the trade name of Ice Castle Arena and has two ice rinks in the commercial building at 990 Castle Shannon Boulevard that are used for sports, entertainment and recreation.  The two rinks are known, respectively, as the Roadside Rink and the Trackside Rink.  Amended Complaint, Dkt. [21], ¶¶ 9, 10, 12; Answer to Amended Complaint, Dkt. [24], ¶¶ 9, 10, 12; TR 18; Exhibits 2c, 2d.

12.     As the lessee and operator of Ice Castle Arena, Ice Castle is subject to the

requirements of Title III of the ADA.  42 U.S.C. § 12182(a)("No individual shall be

discriminated against on the basis of a disability ... by any person who ... leases ...").

13.     Title III of the ADA provides that discrimination by places of public

accommodation "includes a failure to design and construct facilities for first occupancy [after

January 26, 1993], that are readily accessible to and usable by individuals with disabilities,

except where an entity can demonstrate that it is structurally impracticable to meet the

requirements of such subsection in accordance with standards set forth or incorporated by

reference in regulations issued under this subchapter."  42 U.S.C § 12183(a)(1); 28 C.F.R. §

36.401(a)(1).[2]

14.     Construction on Ice Castle Arena began in 1999 and the arena opened in late

2000.  TR 171-172.

15.     Ice Castle Arena is "new construction" within the meaning of Title III of the ADA

since it was designed and constructed "for first occupancy later than 30 months after July 26,

1990."  42 U.S.C. § 12183(a)(1); 28 C.F.R. § 36.401(a)(1).

16.     Newly designed and constructed facilities must be "readily accessible to and

usable by individuals with disabilities."  42 U.S.C. § 12183(a)(1); 28 C.F.R. § 36.401(a)(1).

---

[2]  Congress authorized the Attorney General to issue regulations to carry out the provisions of
Title III of the ADA.  42 U.S.C. § 12186(b).  The regulations may be found at Part 36 of Title 28 of the
Code of Federal Regulations and include Appendix A, Standards for Accessible Design ("Standard" or
the "Standards").

17.     "All areas of newly designed or newly constructed buildings and facilities required to be accessible by [Standards] 4.1.2 and 4.1.3 ... shall comply with [Standards] 4.1 through 4.35 ..."  Standard 4.1.1.

18.     Newly designed and constructed facilities must provide, inter alia, at least one accessible route in compliance with Standard 4.3 (Accessible Route) from the accessible parking spaces to an accessible building.  Standard 4.1.2.

19.     The accessible route must coincide with the route for the general public, to the maximum extent feasible.  Standard 4.3.2(2).

20.     "Accessible route" is defined as a "continuous unobstructed path connecting all accessible elements and spaces of a building or facility.  Interior accessible routes may include corridors, floors, ramps, elevators, lifts, and clear floor space at fixtures.  Exterior accessible routes may include parking access aisles, curb ramps, crosswalks at vehicular ways, walks, ramps, and lifts."  Standard 3.5.

21.     Entrances are to be part of an accessible route between accessible parking and the facility and are also to be connected by an accessible route to all accessible spaces or elements within the building or facility.  Standard 4.14.1

22.     An "entrance" is defined as "[a]ny access point to a building or portion of a building or facility used for the purpose of entering ... and includes the entry door(s) ... and the hardware of the entry door(s) ... ."  Standard 3.5 (Definitions).

23.     At least one accessible route complying with Standard 4.3 must connect accessible facilities, elements and spaces on the same site.  Standard 4.1.2(2), 4.3.2(2).

24.     At least one accessible route complying with Standard 4.3 must connect accessible building entrances with all accessible spaces and elements within the building. Standard 4.1.3(1), 4.3.2(3).

25.     At each accessible entrance to a building, at least one door must comply with Standard 4.13.  Standard 4.1.3(7)(a).

26.     Within a building, at least one door at each accessible space shall comply with Standard 4.13.  Standard 4.1.3(7)(b).

27.     Each door that is an element of an accessible route must comply with Standard 4.13.  Standard 4.1.3(7)©).

28.     Standard 4.13 states that doorways must provide a minimum clear opening of 32 inches with the door open 90 degrees, "measured between the face of the door and the opposite stop."  Standard 4.13.5.

29.     According to the Standards, the minimum clear width for single wheelchair passage must be 32 inches at a point, such as a doorway, and 36 inches continuously.  Standard 4.2.1.

30.     The Standards require the clear opening to account for any "panic" hardware.  TR 124-125, 136-137.

31.     The Standards require that handicapped parking spaces be located on the shortest accessible route from adjacent parking to an accessible entrance.  In buildings with multiple entrances with adjacent parking, handicapped spaces are to be dispersed and located closest to the accessible entrances.  Standard 4.6.2.

32.     The Standards require that accessible elevators must be on an accessible route. Standard 4.10.1.

33.     The Standards require that wheelchair areas are to be an integral part of any fixed seating plan and shall adjoin an accessible route.  At least one companion fixed seat must be provided next to each wheelchair space.  When seating capacity exceeds 300, wheelchair spaces must be provided in more than one location.  Standard 4.33.3

### *Route from Parking Area to Building Entrance*

34.     The main entrance to Ice Castle Arena is located in the middle of the building. Directly in front of the building is a sidewalk with a curb which leads to a two-way driveway which runs between the building and the main parking area.  Exhibit A; TR 19, 23.

35.     The main parking area contains four handicapped parking spaces directly in front of the main entrance to the building.  There are hash marks painted on the pavement between the parking spaces signaling that parking is not permitted on the painted area.  Id.

36.     Previously, handicapped parking spaces were located to the left of (when facing) the main entrance and immediately adjacent to the sidewalk and 2 wheelchair ramps.  TR 173.

37.     Defendants moved the handicapped parking spaces across the driveway to their current locations upon the request of 2 disabled patrons who wanted to be more visible to reception desk staff when accessing their vehicles after daylight hours.  TR 174.

38.     Ambulatory patrons enter Ice Castle Arena from the main parking area by walking from their cars across the driveway area, stepping up onto the sidewalk and walking through the main entrance of the building.  TR 20.

39.     There are no wheelchair curb cuts or ramps directly in front of the main entrance to the building; 2 wheelchair ramps are located to the left side (when facing the entrance) of the main entrance.  Exhibit A.

40.     In order to access the ice rinks, the general ambulatory public enters through the main entrance to Ice Castle Arena and does so in a relatively straight-line fashion from the parking lot.  The general public does not have to zig-zag or backtrack their way as wheelchair users must do.  From the restricted handicapped parking area, wheelchair users must cross the two-lane driveway on a diagonal and/or in a direction away from the main entrance only to be required to double back towards the main entrance after using the wheelchair ramp.  TR 25; Exhibit A.

41.     The access route from the parking lot to the building for wheelchair users does not coincide to the maximum extent feasible with the route for ambulatory patrons.  TR 111.

42.     The Court qualified Sylvester Damianos, a licensed architect, as an expert in design and construction of facilities accessible to and usable by individuals with disabilities.  TR 110-111.

43.     Based on the testimony of Mr. Damianos, whose testimony the Court finds to be credible and unrebutted, an accessible route that coincides to the maximum extent feasible with the route for the general public could be achieved by cutting the curb in front of the entrance to Ice Castle Arena, or elevating the asphalt driveway to the height of the curb between the handicapped parking spaces and the front door of the building, and by painting hash marks on the pavement at the curb cut/ramp to signal that parking is not permitted in that area.  TR 113.

44.     The testimony of Ralph P. Murovich that a curb cut or a wheelchair ramp would create a flooding problem, see TR 212-213, is not credible, particularly in light of the fact that there are 2 wheelchair ramps already in place leading to the sidewalk adjacent to the entrance to the health club and there was no evidence that those ramps posed any such problem.

*Interior Routes*

45.     Once inside the front door, patrons are directed into the lobby that leads to the main floor area.  The main lobby and floor area are separated from the two ice rinks by a wall and doors.  TR 26-27;  Exhibit 2a.

46.     Patrons enter the rinks through a door and then travel up four steps or a ramp to the seating area.  TR 28; Exhibit 2c, 2d, 3.

47.     Ice Castle Arena has a balcony which overlooks both rinks.  The balcony is outside the rink area and is separated from the rink area by large glass windows which enable patrons to look down on the ice and watch games or practices from a heated area of the building.  TR 45-46.

48.     Because the balcony is not integral to the rink, the sounds and excitement in the rink area are muted by the glass.  TR 86-88.

49.     Because the balcony is above the near goals, sight lines from the balcony are not as good when compared to viewing from the bleachers.  TR 67-69, 86-88.

50.     There is no fixed seating on the balcony; however, there are movable tables and chairs there.  TR 86-87.

51.     Ambulatory patrons access the balcony by climbing the stairs behind the reception desk located on the main floor.  TR 27-28; Exhibit 2a.

52.     Wheelchair users must use an elevator to access the balcony.  TR 27-28; Exhibit 2a, 2b.

53.     The Standards require that accessible elevators must be on an accessible route. Standard 4.10.1

54.     In order to reach the elevator from the interior of the building, wheelchair users must proceed down a hallway to the left of (when facing) the reception desk and negotiate an interior door.  TR 27-28; Exhibits 2b, 4h.

55.     In order to reach the elevator from the exterior of the building, ambulatory and wheelchair patrons must enter through a door to the far left of (when facing) the building. Exhibits 4i, A.

56.     Both doors leading to the elevator provide less than 30 inches of clear space for access through the doors because "panic" hardware on the doors narrows what would otherwise measure to be 32 inches of clear space.  TR 43, 123-25.

57.     According to Christman, whose testimony the Court finds to be fully credible, because the "panic" hardware narrows the amount of available clear space, Christman has difficulty getting through these doorways.  TR 43.

58.     The elevator takes patrons to the second floor of the building and opens directly into Club One Xpress's space.  TR 44;  Exhibit 3.

59.     Wheelchair patrons must then traverse the health club's space, maneuvering through aisles in which people are exercising and aisles lined with exercise equipment and, ultimately, through a door that separates the health club from the balcony.  TR 44-45, 92; Exhibit 3.

60.     The balcony is inaccessible to wheelchair users when the health club is closed because the door from the health club to the balcony is locked when the club closes.  TR 45-46; Exhibit 3.

61.     The health club closes at 9:00 p.m. on weekdays and at 4:00 p.m. on Sundays, thus precluding Christman from watching games or practices from the balcony or socializing with other parents who are watching from the balcony, beyond those hours.  TR 19-20, 46.

62.     Zach Christman's practice and game schedule varies from month to month; generally he has two practices each week and a game every 2 weeks.  TR 19-20.

63.     There are times when Zach Christman has practices and games after 9:00 p.m. on weekdays and after 4:00 p.m. on Sundays.  TR 19-20.

64.     There is no "accessible route" connecting the building entrances with the balcony since (a) the balcony is only accessible from the parking lot and from the main lobby through non-compliant doors; (b) the path from the balcony to the elevator is obstructed by a health club, exercise equipment and patrons of the health club; and ©) the elevator is not accessible from the balcony when the health club is closed because the door between the club and the balcony is locked.  TR 123-125.

65.     The fact that an ambulatory patron who might choose to use the elevator to access the balcony travels the same route through the health club as does a wheelchair user (a) is not relevant to the inquiry since the evidence established that ambulatory patrons use the stairs and not the elevator to access the balcony, and (b) does not transform what is not an accessible route into an accessible one.  TR 27-28.

66.     In Mr. Damianos's 40-plus years of experience in designing accessible facilities, he knew of no other building or facility where a patron must traverse another tenant's space within a building in order to reach the tenancy of the building intended to be patronized.  TR 166.

67.     Based on the opinion of Mr. Damianos, which the Court credits, in order to provide an accessible route to the balcony, defendants should install an elevator from the main lobby area to the balcony which does not require a wheelchair user to travel through non-complaint doors and through the health club's space.  TR 125.

### *The Bleachers*

68.     Patrons who want to enter the rink area proceed through the doors below the respective Roadside Rink and Trackside Rink signs.  TR 28; Exhibit 2a.

69.     The seating inside the rink area consists solely of bleachers that are "fixed," i.e., they cannot be "folded up or disassembled in an over night operation."   TR 29; 165-166.

70.     Steel beams, permanently welded to each other, support the bleachers and are bolted to the concrete floor at the bottom and into the bleachers themselves at the top.  TR 116-118, 140-141; Exhibits 4c, 4d, 4e, 4f, 4g.

71.     There are 4 sections of bleachers in each rink and each section contains 5 rows.  In each row, 2 sections are roughly 20 feet long and 2 sections are a little more than 36 feet long. TR 118; Exhibit 4j.

72.     The seating capacity in each rink ranges from 340 to 370, depending upon the width per seat utilized in the calculation.  TR 119-120.

73.     Utilizing a seat width of 18 inches per seat, 370 patrons could occupy the bleachers in each rink.  Id.; Exhibit 4j.

74.     The Court takes judicial notice of the fact that a seat width of 18 inches per seat is the "standard" for bleachers according to the International Construction Code, adopted by the City of Pittsburgh.  ICC/ANSI 300-2007, Standard for Bleachers, Folding and Telescopic Seating, and Grandstands, § 403.1 (Occupant Load).

75.     Utilizing a seat width of 19 inches per seat, 340 patrons could occupy the bleachers in each rink.  Exhibit 4j.

76.     The seat width for patrons at Heinz Field, whose temperature conditions often equate with those in the rinks at Ice Castle Arena, is 19 inches.  TR 148.

77.     Based on Findings #74 and #76,  the per person seat width for the bleachers at Ice Castle Arena should be 18-19 inches.

78.     Utilizing a seat width of 22 inches per seat, 305 patrons could occupy the bleachers in each rink.  Id.

79.     The unrebutted testimony of Plaintiff's expert, whose testimony the Court finds credible, established that a seat width of 22 inches is not standard for bleacher seating.  TR 148.

80.     Contrary to defendant's claim, plaintiff's proposed seating design does not provide for a seat width of 24 inches per person.  Rather, the "two feet by zero inches" referenced appears to represent the amount of foot space or leg room between each row of seats.  See Exhibit 5.

81.     In places of assembly with fixed seating, whose seating capacity is between 301 and 500, 6 wheelchair locations are required.  Standard 4.1.3(19).

82.     There are no wheelchair spaces provided in the bleachers - - or anywhere else - - in either rink at Ice Castle Arena.  TR 29, 113-114; Exhibit 3.

13

83.     Wheelchair areas are to be an integral part of any fixed seating plan.  Standard 4.33.3.

84.     At least one companion fixed seat must be provided next to each wheelchair seating area.  Id.

85.     When the seating capacity exceeds 300, wheelchair spaces must be provided in more than one location.  Id.

86.     The seating capacity in each rink at Ice Castle Arena exceeds 300.  TR 119-120; Exhibit 4j.

87.     Where bleacher capacity is less than 300, wheelchair seating may be clustered in one location.  Standard 4.33.3.

88.     There are two sets of bleachers in each rink separated by stairs and a gap.  TR 30-34; Exhibits 2f, 2g, 3.

89.     Generally, fans of the "home" team sit in one set of bleachers and fans of the "away" team sit in the other set.  TR 37-38.

90.     Sometimes Zach Christman's team is the "home" team and sometimes it is the "away" team.  TR 38.

91.     Christman cannot access the set of bleachers at the far end of each rink, i.e., the set of bleachers most distant from the entrance door, because the separation and steps prohibit wheelchair access to that location from the set of bleachers closest to the entrance door.  There is no other means of access to the distant set of bleachers.  TR 30-34, 43; Exhibits 2f, 2g, 3.

92.     If Christman's son's team is the "away" team and the team's fans sit in the most distant bleachers, Christman is relegated to sitting with strangers in the "home" team's bleachers. TR 38.

93.     There is no seating on the floor area of the rinks although patrons may stand at the near end of the rink to watch the activity on the ice.  TR 31-32, 34, 116.

94.     The floor at the end of the rinks is not within the footprint of the seating layout or otherwise an integral part of the fixed seating at either of the rinks at Ice Castle Arena.  TR 114.

95.     For wheelchair users, visibility of activity on the ice from the floor area at the near end of the rink is partially obstructed by the batter board.  TR 33-34, 114-116; Exhibits 3, 4a, 4b.

96.     If Christman wants to sit in the bleachers he must sit in the access aisle in front of the bleachers.  TR 34-36; Exhibits 2h, 3.

97.     The access aisle serves as the means of ingress and egress to the bleachers for all patrons.  Exhibits 2h, 3.

98.     If Christman sits in the aisle, other patrons must climb over him, or he must position himself next to the stairway so that patrons may climb around him since the area available to pass in front of him when he is parked in the access aisle is no more than 8 inches. TR 34-36; Exhibits 2h, 3.

99.     In the expert opinion of Mr. Damianos, which was not rebutted, in order to comply with the ADA requirements for bleacher seating under the present circumstances, defendants should install one wheelchair space at the end of each set of bleachers and four wheelchair spaces with companion seating at center ice or near center ice, with a portable or fixed platform across the gap between the bleachers.  TR 119-123; Exhibits 3, 4k, 4l.

*Miscellaneous*

100.    Prior to bringing suit, Christman brought the accessibility problems faced by wheelchair users in Ice Castle Arena to the attention of the defendants, who took no corrective action.  TR 47-56.

101.    The testimony of Ralph P. Murovich that the facility was constructed in compliance with all applicable codes and standards, including the ADA, is simply not credible in light of the requirement in the ADA that places of public accommodation provide integral handicapped seating in areas of fixed seating since Ice Castle Arena has absolutely no handicapped seating in the bleachers, or anywhere else for that matter.  TR 196-197.

102.    Any testimony concerning the fact that Ice Castle Arena had been issued an occupancy permit and had had its "plans" approved by the Pennsylvania Department of Labor and Industry, see TR 195-197, 225, see also Exhibit 8, is simply not relevant to the issue at hand, to wit, whether the newly designed and constructed facility complies with the ADA, since there was no evidence that a determination regarding compliance with ADA requirements attended the issuance of the occupancy permit and the plan approval.

103.    There was no evidence presented that Pennsylvania or any local government applied to the United States Attorney General for a certification of equivalency that a specific state or local building code or ordinance meets or exceeds the minimum requirements of the ADA.  28 C.F.R. § 36.602.

104.    Section 36.602 provides that an equivalency certification would constitute a rebuttable presumption that the state or local ordinance did meet or exceed the minimum requirements of Title III.  Id.

105.     The testimony of Ralph P. Murovich was not credible.

106.     The testimony of Ralph J. Murovich was not credible.

107.     Although the Standards require vertical dispersal of wheelchair seating, Christman

is not seeking vertical dispersal; he is seeking aisle level seating only.  See Plaintiff's Objections

to Defendants' Proposed Findings of Fact and Conclusions of Law, Dkt. [43] at ¶ 8.

108.     In the case of a violation of 42 U.S.C. § 12183(a) concerning new construction,

injunctive relief "shall include an order to alter facilities to make such facilities readily accessible

to and usable by individuals with disabilities to the extent required by" Title III.  42 U.S.C. §

12188(a)(2).


CONCLUSIONS OF LAW

1.     This civil action arises under the Americans with Disabilities Act of 1990, as

amended, 42 U.S.C. §§ 12101, et seq. ("ADA").  Accordingly, the Court has subject matter

jurisdiction pursuant to 28 U.S.C. § 1331.

2.     Title III of the ADA addresses the prohibition of discrimination by places of

public accommodation.  The general rule, set forth in Section 12182(a), provides as follows:

> No individual shall be discriminated against on the basis of a disability in
> the full and equal enjoyment of the goods, services, facilities, privileges,
> advantages, or accommodations of any place of public accommodation by
> any person who owns, leases (or leases to), or operates a place of public
> accommodation.

42 U.S.C. § 12182(a).

3.     The term "public accommodation" includes private ice rinks, such as Ice Castle

Arena.  42 U.S.C. § 12182(7)(providing that private entities, such as "a gymnasium, health spa,

bowling alley, golf course, or other place of exercise or recreation," are considered public accommodations if their operations affect commerce).

4.      "Goods, services, facilities, privileges, advantages, and accommodations shall be afforded to an individual with a disability in the most integrated setting appropriate to the needs of the individual."  42 U.S.C. § 12182(b)(1)(B); see also, 28 C.F.R. § 36.203.

5.      Discrimination by places of public accommodation "includes a failure to design and construct facilities for first occupancy [after January 26, 1993], that are readily accessible to and usable by individuals with disabilities, except where an entity can demonstrate that it is structurally impracticable to meet the requirements of such subsection in accordance with standards set forth or incorporated by reference in regulations issued under this subchapter."  42 U.S.C § 12183(a)(1); 28 C.F.R. § 36.401(a)(1).  See also Caruso v. Blockbuster-Sony Music Entertainment Center at Waterfront, 193 F.3d 730, 731 (3d Cir. 1999).

6.      Ice Castle Arena is a place of public accommodation within the meaning of the ADA.  42 U.S.C. § 12181(7)(providing that private entities, such as "a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation," are considered public accommodations if their operations affect commerce).

7.      Title III of the ADA provides that discrimination by places of public accommodation "includes a failure to design and construct facilities for first occupancy [after January 26, 1993], that are readily accessible to and usable by individuals with disabilities, except where an entity can demonstrate that it is structurally impracticable to meet the requirements of such subsection in accordance with standards set forth or incorporated by

reference in regulations issued under this subchapter." 42 U.S.C § 12183(a)(1); 28 C.F.R. § 36.401(a)(1).

8.      Construction on Ice Castle Arena began in 1999 and the arena opened in late 2000. TR 171-172.

9.      Ice Castle Arena is new construction within the meaning of Title III of the ADA since it was designed and constructed for first occupancy after January 26, 1993. U.S.C. § 12183(a)(1); 28 C.F.R. §§ 36.401, 36.406.

10.      As an owner and lessor of Ice Castle Arena, Tymaco is subject to the requirements of Title III of the ADA. 42 U.S.C. § 12182(a)("No individual shall be discriminated against on the basis of a disability ... by any person who owns ... (or leases to) ...").

11.      As the lessee and operator of Ice Castle Arena, Ice Castle is subject to the requirements of Title III of the ADA. 42 U.S.C. § 12182(a)("No individual shall be discriminated against on the basis of a disability ... by any person who ... leases ...").

12.      Full compliance with the requirements of Title III and standards for new construction will be considered structurally impracticable "only in those rare circumstances when the unique characteristics of terrain prevent the incorporation of accessibility features." 28 C.F.R. § 36.401(c)(1).

13.      There is no evidence of record that any characteristics of the terrain at Ice Castle Arena would excuse compliance with Title III of the ADA due to structural impracticability.

14.      Title III of the ADA creates a private right of action in individuals with disabilities for injunctive relief to redress violations of Title III. 42 U.S.C. § 12188(a)(1); 42 U.S.C. § 2000a-3(a); 28 C.F.R. §36.501(a).

15.     In the case of a violation of 42 U.S.C. § 12183(a) concerning new construction, injunctive relief "shall include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities to the extent required by" Title III.  42 U.S.C. § 12188(a)(2).

16.     Plaintiff does not claim that the defendants failed to make reasonable modifications in policies, practices and procedures under 42 U.S.C. § 12182(b)(2)(A)(ii) and, hence, plaintiff is not required to prove that a modification was requested and that such modification is reasonable.

17.     Plaintiff's claim is that the defendants failed to comply with the ADA in the design and construction of Ice Castle Arena and thereby discriminated against plaintiff as prohibited by 42 U.S.C. § 12183(a)(1).

18.     "Among the broadly stated purposes of the ADA, see 42 U.S.C. § 12101 (b), is the intent to 'invoke the sweep of congressional authority ... in order to address the major areas of discrimination faced day-to-day by people with disabilities.' Id. § 12101(b)(4).  This comes after a specific finding by Congress that discrimination against individuals with disabilities persists in many critical areas ... .'  42 U.S.C. § 12101(a)(3).  Indeed, there is little doubt that Congress intended the ADA as a comprehensive remedial statute with broad ramifications.  See 42 U.S.C. § 12101(b)(1); Penny v. United Parcel Serv., 128 F.3d 408, 414 (6th Cir.1997)."  Menkowitz v. Pottstown Memorial Medical Center, 154 F.3d 113, 118 (3d Cir. 1998).

19.     Title III of the ADA provides that newly designed and constructed facilities must be "readily accessible to and usable by individuals with disabilities."  42 U.S.C. § 12183(a)(1); 28 C.F.R. § 36.401(a)(1).

20.     "All areas of newly designed or newly constructed buildings and facilities required to be accessible by [Standards] 4.1.2 and 4.1.3 ... shall comply with [Standards] 4.1 through 4.35 ..."  Standard 4.1.1.

21.     Newly designed and constructed facilities must provide, inter alia, at least one accessible route in compliance with Standard 4.3 (Accessible Route) from the accessible parking spaces to an accessible building.  Standard 4.1.2.

22.     The accessible route must coincide with the route for the general public, to the maximum extent feasible.  Standard 4.3.2(2).

23.     "Accessible route" is defined as a "continuous unobstructed path connecting all accessible elements and spaces of a building or facility.  Interior accessible routes may include corridors, floors, ramps, elevators, lifts, and clear floor space at fixtures.  Exterior accessible routes may include parking access aisles, curb ramps, crosswalks at vehicular ways, walks, ramps, and lifts."  Standard 3.5.

24.     Entrances are to be part of an accessible route between accessible parking and the facility and are also to be connected by an accessible route to all accessible spaces or elements within the building or facility.  Standard 4.14.1

25.     An "entrance" is defined as "[a]ny access point to a building or portion of a building or facility used for the purpose of entering ... and includes the entry door(s) ... and the hardware of the entry door(s) ... ."  Standard 3.5 (Definitions).

26.     At least one accessible route complying with Standard 4.3 must connect accessible facilities, elements and spaces on the same site.  Standard 4.1.2(2), 4.3.2(2).

27.     At least one accessible route complying with Standard 4.3 must connect accessible building entrances with all accessible spaces and elements within the building. Standard 4.1.3(1), 4.3.2(3).

28.     At each accessible entrance to a building, at least one door must comply with Standard 4.13.  Standard 4.1.3(7)(a).

29.     Within a building, at least one door at each accessible space shall comply with Standard 4.13.  Standard 4.1.3(7)(b).

30.     Each door that is an element of an accessible route must comply with Standard 4.13.  Standard 4.1.3(7)©).

31.     Standard 4.13 states that doorways must provide a minimum clear opening of 32 inches with the door open 90 degrees, "measured between the face of the door and the opposite stop."  Standard 4.13.5.

32.     According to the Standards, the minimum clear width for single wheelchair passage must be 32 inches at a point, such as a doorway, and 36 inches continuously.  Standard 4.2.1.

33.     The Standards require that handicapped parking spaces be located on the shortest accessible route from adjacent parking to an accessible entrance.  In buildings with multiple entrances with adjacent parking, handicapped spaces are to be dispersed and located closest to the accessible entrances.  Standard 4.6.2.

34.     The Standards require that accessible elevators must be on an accessible route. Standard 4.10.1.

35.     The Standards require that wheelchair areas are to be an integral part of any fixed seating plan and shall adjoin an accessible route.  At least one companion fixed seat must be provided next to each wheelchair space.  When seating capacity exceeds 300, wheelchair spaces must be provided in more than one location.  Standard 4.33.3

36.     Defendants have violated the ADA by discriminating against Christman in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of Ice Castle Arena in that the newly designed and constructed arena is not  "readily accessible to and usable by individuals with disabilities"  as required by 42 U.S.C. § 12183(a)(1) and 28 C.F.R. § 36.401(a)(1).  As discussed below, the arena is not "readily accessible to and usable by individuals with disabilities" in that (a) it does not provide wheelchair users with an accessible route from the parking lot to the Ice Castle Arena that coincides to the maximum extent feasible with the route taken by the general public and/or by failing to locate the handicapped parking spaces on the shortest route from adjacent parking to an accessible building; (b) it has doorways to the elevator lobby that do not comply with the minimum required space for a clear opening; ©) the elevator and the balcony area are not on an "accessible route;" and (d) there are no wheelchair areas that are an integral part of the fixed seating.

37.     As previously noted, newly designed and constructed facilities must provide wheelchair users with an accessible route from the accessible parking lot to the accessible building entrance that coincides to the maximum extent feasible with the route for the general public.  See Standard 4.3.2(2).  Defendants are in violation of this requirement.

In order to access the ice rinks, the general public enters through the main entrance to Ice Castle Arena and does so in a relatively straight-line fashion from the parking lot.  The general

public does not have to zig-zag or backtrack their way as wheelchair users must do. From the restricted handicapped parking area, wheelchair users must cross the two-lane driveway on a diagonal and/or in a direction away from the main entrance only to be required to double back towards the main entrance after using the wheelchair ramp. According to plaintiff's expert, whose testimony the Court found to be credible and unrebutted, it is clearly feasible to make a curb cut or install a wheelchair ramp directly across from the current location of the handicapped parking, and to paint hash marks on the pavement to keep the area clear of parked cars, so as to allow wheelchair users to have a route to the main entrance that coincides with the route for the general public.

Alternatively, defendants could easily relocate the handicapped parking to the area initially utilized, i.e., to the left of (when facing) the main entrance, alongside the two existing wheelchair ramps, which would eliminate the zig-zag or doubling back route and which would provide a route to the main entrance that coincides to the maximum extent feasible with the route for the general public.

While there is another exterior door through which patrons of Ice Castle Arena might enter, i.e., the door leading to the health club, the evidence demonstrated that most patrons use the main entrance. Hence, any route from the parking lot through this other exterior door would not coincide to the maximum extent feasible with the route for the general public. As well, this other entrance would not be located on the shortest route from adjacent handicapped parking as required by Standard 4.6.2.

38. Moreover, in order to access the ice rinks from the exterior doorway to the left of the main entrance, a wheelchair patron encounters two doors that have less than the requisite 32

24

inches of clear, i.e., unobstructed, opening space, as measured between the face of the door and the opposite stop when open 90 degrees, see Standard 4.13.5, due to the fact that the door hardware, referred to as "panic" hardware, protrudes into and thus, decreases the required minimum clear opening, see Standard 4.2.1, by several inches. Therefore, both the exterior door and an interior door do not meet the required minimum clearance to allow a wheelchair user to enter unimpeded.

The defendants would have the Court find these doors to be in compliance by measuring from the face of the doors, without accounting for the fact that the panic hardware decreases the clear space by several inches. The panic hardware runs along virtually the entire width of the door itself at a point a little less than half the height of the door, see Exhibits 4h and 4i, and plaintiff testified that this hardware makes it difficult to negotiate through the doorway. Defendants point to Figure 24, referenced in Standard 4.13.5 (Clear Width), which shows the area to be measured, i.e., from the face of the door to the opposite stop. However, Figure 24 is not persuasive since it shows a simple handle type of door opening hardware at the far end of the door, i.e., hardware that does not protrude into what is supposed to be clear space and does not reduce the clear width space by several inches. Moreover, the unrebutted expert testimony established that the Standards require the clear opening to account for any panic hardware. Accordingly, these two doors are in violation of the requirements of the ADA.

39.     Defendants have violated the ADA and the Standards because the elevator is not on an accessible route. As discussed, in order to access the elevator from the first floor level of the arena, a wheelchair user must negotiate non-compliant doors. Further, once a wheelchair patron reaches the second floor, he/she must traverse the health club facility, including aisles in

which health club patrons are exercising. Lastly, the elevator is not accessible from the balcony when the health club is closed because the door between the balcony and the club is locked when the club is closed. As plaintiff's expert indicated, the route to the elevator for wheelchair users is simply not an accessible route. Moreover, the expert was unaware of any other building or facility where a patron is required to traverse another tenant's space within a building/facility in order to reach the area of the building/facility intended to be patronized.

40.     Defendants' supermarket and department store analogies are misplaced since patrons of those businesses are not required to traverse another business, e.g., a health club, in order to get from point A to point B in the supermarket or the department store, as wheelchair users must do in order to access the balcony at Ice Castle Arena.

41.     Defendants have violated the ADA and the Standards because the balcony is not on an accessible route. Specifically, the balcony is accessible by wheelchair users only by elevator and, as the Court has determined, the elevator is not on an accessible route because (a) the elevator is only accessible through non-compliant doors; (b) the path from the balcony to the elevator is obstructed by a health club, exercise equipment and patrons of the health club; and ©) the door between the balcony and the club is locked when the health club is closed, rendering the balcony inaccessible during hours when Zach Christman has practices and games. As plaintiff's expert indicated, he was unaware of any other building or facility where a patron is required to traverse another tenant's space within that building/facility in order to reach the area of the building/facility intended to be patronized.

42.     Standard 4.1.3(19) requires that, in places of assembly with fixed seating, whose seating capacity is between 301 and 500, 6 wheelchair locations are required. The wheelchair

seats are to be an integral part of the fixed seating.  As the Court has already found, the seating

capacity at Ice Castle Arena is between 340 and 370.  Therefore, one should expect to find 6

wheelchair locations in the bleachers.  Incredibly, Ice Castle Arena has **no** wheelchair seating in

the bleachers, or anywhere else for that matter.

Defendants point to Standard 4.33.3 and suggest that they may cluster wheelchair seating

in other areas of the rink and/or balcony and still be in compliance with the ADA.  This Standard

provides as follows:

### 4.33.3 Placement of Wheelchair Locations

Wheelchair areas shall be an integral part of any fixed seating plan and shall be
provided so as to provide people with physical disabilities a choice of admission
prices and lines of sight comparable to those for members of the general public.
They shall adjoin an accessible route that also serves as a means of egress in case
of emergency.  At least one companion fixed seat shall be provided next to each
wheelchair seating area.  When the seating capacity exceeds 300, wheelchair
spaces shall be provided in more than one location.  Readily removable seats may
be installed in wheelchair spaces when the spaces are not required to
accommodate wheelchair users.

EXCEPTION:  Accessible viewing positions may be clustered for bleachers,
balconies, and other areas having sight lines that require slopes of greater than 5
percent.  Equivalent accessible viewing positions may be located on levels having
accessible egress.

Defendants interpret the so called "Bleacher/Balcony Exception" to excuse them from placing

wheelchair spaces in the bleachers.  Defendants have cited no authority in support of their

interpretation and we have found none.

Indeed, this Court agrees with plaintiff that defendants' interpretation is "absurd."  See

Plaintiff's Objections to Defendants' Proposed Findings of Fact and Conclusions of Law, Dkt.

[43], at ¶ 92.  The few courts that have considered the "Bleacher/Balcony Exception" have

expressly rejected the argument the defendants are making here.  Lara v. Cinemark USA, Inc., 207 F.3d 783, 787 n.3 (5th Cir. 2000); Colorado Cross-Disability Coalition v. Colorado Rockies Baseball Club, 336 F.Supp.2d 114, 1146-49 (D.Colo. 2004)(The Court agreed that the exception " 'is not an exemption from the requirements for integrated or companion seating or choice in admission prices.  Where dispersion is feasible, it must be achieved.' (cit. omitted).")(citing cases).  As the Colorado Rockies court noted, the Department of Justice has explained that it purposefully required wheelchair seating to be an integral part of a fixed seating plan " 'so that people using wheelchairs are not isolated from other spectators or their friends or family.' " Id., at 1147 (quoting Department of Justice, Accessible Stadiums 1 (1996)).

As well, defendants' interpretation runs contrary to the admonition in Caruso that wheelchair users must have access to all seating locations, without regard to whether existing, accessible seating locations provide superior viewing angles.  Caruso, 193 F.3d at 739-40.

It must be emphasized that, in passing the ADA, Congress recognized that

[h]istorically, persons with disabilities have been relegated to separate and often inferior services.  For example, seating for persons using wheelchairs is often located in the back of auditoriums.  In addition to providing inferior seating, the patron in a wheelchair is forced to separate from family or friends during the performance.

H.R.Rep. No. 101-485, pt. 2 at 102 (1990), U.S.Code Cong. & Admin.News 1990, pp. 303, 385. Title III of the ADA prohibits such discrimination by places of public accommodation and requires these facilities "to be designed, constructed, and altered in compliance with the accessibility standards established by " Part 36 of Title 28 of the Code of Federal Regulations. 28 C.F.R. § 36.101.

Defendants have violated the ADA and the Standards because, incredibly in this enlightened age, Ice Castle Arena constructed - - and apparently designed - - its facility with no wheelchair seating in the bleachers.

43.     In order to remedy their violations of the ADA and the Standards, defendants shall *either* provide a curb cut or wheelchair ramp in front of the main entrance to Ice Castle Arena along with hash marks painted on the pavement between the parking lot and the curb cut/ramp to indicate that parking is not permitted in the painted area, *or* return the handicapped parking spaces to their previous location, that is, to the left of (when facing) the main entrance, alongside the two existing wheelchair ramps.

43.     In order to remedy their violations of the ADA and the Standards, defendants shall install at Ice Castle Arena an elevator to provide wheelchair users an accessible route from the main lobby to the balcony that does not involve traveling through the health club space and that does not involve traversing doorways with clear opening space that is less than 32 inches, taking panic hardware into account in measuring the clear opening space.

44.     In order to remedy their violations of the ADA and the Standards, defendants shall install *either* six wheelchair spaces, with companion seating, as set forth in plaintiff's Exhibit 4k, in both the Roadside Rink and the Trackside Rink, *or* six wheelchair spaces with companion seating, within the footprint of the bleachers, at least one of which must be in the set of bleachers further from the main entrance (and accessible to wheelchair users by way of a portable or fixed platform across the gap between the two sets of bleachers), and at least two of which must be located within the second or third quartile of the total row length, that is, at center ice or in the bleacher section closest to center ice in both the Roadside Rink and the Trackside Rink.

An appropriate Order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MARK J. CHRISTMAN,                        )
                    Plaintiff        )
                                )
        vs.                                      )      Civil Action No. 07-397
                                )      Magistrate Judge Amy Reynolds Hay
TYMACO, INC. and                          )
ICE CASTLE, INC.,                         )
               Defendants        )

## ORDER

AND NOW, this 5th day of May, 2008, IT IS HEREBY ORDERED that

Judgment is entered in favor of the Plaintiff and against the Defendants in this case.

IT IS FURTHER ORDERED that, pursuant to 42 U.S.C. § 12188(a)(2), to remedy

their violations of the Americans with Disability Act of 1990, as amended, 42 U.S.C. §§ 12101,

et seq., the Defendants shall alter Ice Castle Arena to make its facilities readily accessible to and

usable by individuals with disabilities as follows:

      1.      Defendants shall *either* provide a curb cut or wheelchair ramp in front of the main entrance to Ice Castle Arena along with hash marks painted on the pavement between the parking lot and the curb cut/ramp to indicate that parking is not permitted on the painted area, *or* return the handicapped parking spaces to their previous location, that is, to the left of (when facing) the main entrance, alongside the two existing wheelchair ramps.

      2.      Defendants shall install an elevator to provide wheelchair users an accessible route from the main lobby to the balcony that does not involve traveling through the health club space and that does not involve traversing doorways with clear opening space that is less than 32 inches, taking panic hardware into account in measuring the clear opening space.

3.      Defendants shall install *either* six wheelchair spaces, with companion seating, as set forth in plaintiff's Exhibit 4k, in both the Roadside Rink and the Trackside Rink, *or* six wheelchair spaces with companion seating, within the footprint of the bleachers, at least one of which must be in the set of bleachers further from the main entrance (and accessible to wheelchair users by way of a portable or fixed platform across the gap between the two sets of bleachers), and at least two of which must be located within the second or third quartile of the total row length, that is, at center ice or in the bleacher section closest to center ice in both the Roadside Rink and the Trackside Rink.

IT IS FINALLY ORDERED that on or before June 20, 2008, defendants shall

submit a proposal to remedy the deficiencies as described above including a reasonable time

table advising the Court of when said remedies will be accomplished.


                                                      /s/ *Amy Reynolds Hay*
_____United States Magistrate Judge


cc:     All counsel of record by Notice of Electronic Filing